Ronald BOYCE, Connie J. Hansen, Kathy Kelley, Gloria Watkins, Lashon R. Anthony–Lofgren, Linda McLeod–Alexis, Doris L. Harris and Bertha Stephens, individually and on behalf of all other persons similarly situated, Plaintiffs,

v.

HONEYWELL, INC., Defendant.

No. 8:98–CV–989–T–26A.

United States District Court, M.D. Florida, Tampa Division.

Feb. 17, 2000.

---

**1.** *See* FED.R.EVID. 609.

David J. Linesch, The Linesch Firm, Palm Harbor, FL, for Plaintiffs.

James Richard Wiley, Gwynne Alice Young, Carlton, Fields, Ward, Emmanuel, Smith & Cutler, P.A., Tampa, FL, Sylvia H. Walbolt, Carlton, Fields, Ward, Emmanuel, Smith & Cutler, P.A., St. Petersburg, FL, for defendants.

## ORDER

LAZZARA, District Judge.

Before the Court are Plaintiffs' Motion for Class Certification and supporting memorandum (Dkts. 48 and 67), the response of Honeywell, Inc. (Honeywell) (Dkt. 68), Plaintiffs' Amended Motion for Class Certification (Dkt. 88), Honeywell's memorandum in opposition (Dkt. 89), and the volumes of declarations, affidavits, depositions, employment guidelines, statistical reports, notices of supplemental authority, and other documents submitted in support of and in opposition to class certification. Although the submissions are voluminous, they have proved extremely beneficial to the Court in sorting out the decision-making structure of Honeywell's Clearwater operations and determining whether this case fits into the rare exception to the general rule that "across the board" discrimination cases under Title VII are no longer viable. After careful consideration of the entire file and relevant law, the Court is of the opinion that class certification would not be appropriate in this particular case.

### Allegations

Eight plaintiffs bring this action, on behalf of themselves and others similarly situated, pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., and the Civil Rights Act of 1991, 42 U.S.C. § 1981a (count I), and the Florida Civil Rights Act of 1992 (count II). (Dkt. 11 at paras. 2 and 24). The complaint[1] alleges that Honeywell discriminated against the named plaintiffs and the classes they represent "in all aspects of employment, including hiring, terms and conditions of employment, promotional opportunities, termination and layoff." (Dkt. 11 at para. 21). Plaintiffs list seventeen remarks or "anecdotal comments"[2] which allegedly evidence a pattern or practice of gender, race and national origin bias. (Dkt. 11 at para. 22).

---

1. The operative complaint in this case is the First Amended Complaint. (Dkt. 11).

2. This is the term used by the parties.

The complaint seeks various redress ranging from injunctive and other equitable relief to compensatory and punitive damages in the amount of $100 million. (Dkt. 11 at paras. 11, 12, and the wherefore clause). Specifically, paragraph 11 of the complaint provides as follows:

This proceeding is for declaratory judgment of the Plaintiffs' rights and for a permanent injunction restraining Defendant from maintaining a policy, practice, and/or custom of discriminating against Plaintiffs in this class because of gender, race and national origin, with respect to privileges of employment and in ways which deprive Plaintiffs and other persons in the class of equal employment opportunities and otherwise adversely affect their status as employees because of gender, race and national origin. This Complaint also seeks restitution to Plaintiffs and the class they represent of all rights, privileges, benefits and income that would have been received by them but for Defendant's unlawful an discriminatory practices. This Complaint further seeks compensatory and punitive damages for Plaintiffs and the class they represent.

(Dkt. 11 at para. 11). The wherefore clause alleges that "Plaintiffs' estimate the above referenced liability to approximate $100 million in overall relief." (Dkt. 11 at page 10).

Plaintiffs' motion raises additional theories of recovery not specifically mentioned in the complaint. In their motion, Plaintiffs assert they are seeking recovery under both disparate treatment and disparate impact theories. (Dkt. 67 at page 22). Also in their motion, Plaintiffs claim they are seeking recovery based on a hostile work environment. (Dkt. 67 at pages 2–4).

Plaintiffs essentially assert that recruitment at Honeywell is done by "word of mouth" and employees are financially rewarded for referring applicants who are then hired by Honeywell. (Dkt. 67 at page 17).

Plaintiffs claim that the statistics reveal the under-representation of minorities.

### Proposed Class

After this Court denied Plaintiffs' request to add a job applicant as a named plaintiff,[3] Plaintiffs amended their proposed class as follows:

All salaried non-bargaining unit employees who have been denied employment, fair compensation, fair promotion and/or who have suffered a hostile work environment as a result of their gender, their color/race. The class is limited to salaried employees and specifically excludes any jobs covered by a collective bargaining agreement.

(Dkt. 88). Plaintiffs suggest that the class be composed of two subclasses:

Subclass I: All female employees alleging gender discrimination.

Subclass II: All nonwhite employees alleging racial discrimination.

(Dkt. 88).

The eight representative plaintiffs are all salaried present or former employees of Honeywell. Five are African–American women, one is an African–American man, one is a native American woman, and the other is a white woman. (Dkt. 67 at pages 2–4). One of the African–American women has now retired. (Dkt. 67 at page 4).

All of the named plaintiffs are or were employed at one of two Honeywell operations in Clearwater, Florida: the Space and Strategic Systems Operations (SASSO) and the Guidance and Navigation Operation (GNO). (Dkt. 67 at page 4). The complaint asserts that Honeywell "has been and is engaged in employment practices that emanate from a common plan or scheme that uniformly governs all employees and potential employees of [Honeywell] throughout the United States." (Dkt. 11 at para. 27). Plaintiffs have allegedly "suffer[ed] the effects of this gender, race and national origin discrimination in their terms and conditions of employment, including their lack of advancement

---

**3.** Plaintiffs also cited the issuance of this Court's in *Carter v. West Publishing Co.,* 1999 WL 376502 (M.D.Fla. May 20, 1999), as a reason for amending the proposed class. This Court certified a class in *West,* and the Eleventh Circuit granted review of the class certification. *See West Publishing Co. v. Carter,* 1999 WL 996377 (11th Cir. June 30, 1999). That appeal has not yet been decided.

and their disparate treatment with regard to evaluation, compensation, promotion, termination and layoff." (Dkt. 11 at para. 25).

The class allegations in the complaint indicate that the class may be over 5,000 individuals. (Dkt. 11 at para. 26). The statistical analysis of Dr. Peterson,[4] however, reveals that the targeted workforce is approximately 2,342 employees of which 32.8% are women and 11.7% are minorities. (Dkt. 67 at page 19).

### Pertinent Background

Honeywell has three major businesses in the United States. (Dkt. 68 at Vol. I at A1 and Exh. 1). Only one of those three businesses——Space and Aviation Control——has divisions, some of which are subdivided into operations. (Id.). One of the five divisions of Space and Aviation Control is Space Systems and is located in Clearwater, Florida. (Id.). SASSO is one of the four operations of Space Systems and the only operation located in Clearwater. (Id.). Another division of Space and Aviation Control is Sensor and Guidance Products and is located in Minneapolis, Minnesota. One of Sensor and Guidance Products' operations is GNO located in Clearwater. (Id.).

SASSO currently has approximately 1,400 employees performing 275 distinct job functions, and GNO has 600 employees performing 75 distinct job functions. (Dkt. 68 at Vol. I at A1 at para. 6). The "Clearwater campus" is divided into five plants. (Id. at para. 4). SASSO is located primarily in plants 1, 2, 3, and 5, with about 60 employees housed in plant 4. (Id. at para. 4). GNO is located exclusively in plant 4. (Id. at para. 4). SASSO and GNO are "essentially independent businesses." GNO designs, builds, and supplies guidance and navigation systems for military aircraft, missiles, and tactical guidance operations. (Id. at para. 7). SASSO designs, develops, and supplies mission-criti-

cal products for satellites, launch vehicles, and major strategic systems including the Space Shuttle program. (Id.). SASSO sells technological solutions whereas GNO sells manufactured units. (Id. at para. 8). With respect to management philosophies and personnel, the two operations do not overlap. (Id. at para. 13 and Exhs. 12 and 13).

The current Director of Human Resources for SASSO, a 52–year old white female,[5] avers that SASSO and GNO maintain different job structures.[6] (Dkt. 68 at Vol. I at A1 at para. 10). SASSO and GNO were separately reorganized in 1996 and 1997, respectively, in dissimilar fashions. (Id.). The management teams of SASSO and GNO are completely separate. (Id. at para. 13 and Exhs. 12 and 13). SASSO and GNO have separate and distinct employee performance assessment processes. (Id. at para. 17 and Exhs. 14, 15, and 16).

The Corporate Human Resources Guides serve as the primary basis for each business unit to update or prepare its own human resource guidelines. (Dkt. 68 at Vol. I at A1 at para. 19 and Exh. 17). SASSO and GNO use one set of Human Resource Guidelines. (Id. at para. 19 and Exh. 18). The Human Resources personnel provide oversight and approval functions for employee actions that affect pay[7] and promotions. (Id. at para. 21). Apparently, even though the supervisors and managers make certain decisions, those decisions may require as much as a four-level signature process. (Id.).

"Relative rankings" are used to determine the value of the employee to his or her particular department. (Dkt. 68 at Vol. I at A1 at para. 29). According to Ms. Bowman, the relative rankings are not entirely subjective and are based on both objective and subjective components, including the specific skill factors essential to a particular job. (Id. at para. 31). Stephanie Belvin, the Human

---

4. He is one of the Plaintiffs' experts.

5. Dave Brumbaugh, a 45–year old white male, was the Director of Human Resources for SASSO, from 1992 until 1998 when he received a promotion. (Dkt. 68 at Vol. II at A6 at paras. 2 and 3).

6. Pamela Joan Bowman began her career at Honeywell in 1966 as a clerk/typist. (Dkt. 68 at Vol. I at A1 at para. 2). She has worked for both SASSO and GNO. (Id.).

7. The pay program for SASSO is designed in Clearwater, whereas the pay program for GNO is designed in Minnesota. (Dkt. 68 at Vol. 1 at A1 at paras. 26 and 27).

Resources Manager for GNO concurs with Ms. Bowman's explanation of the differences between GNO and SASSO. (Dkt. 68 at Vol. II at A5 at para. 5). Ms. Belvin avers that although there is no formal process for relative ranking at GNO, the engineering groups regularly prepare relative rankings. (*Id.* at para. 4).

With respect to promotions, the company has a policy of promoting from within. (*Id.* at para. 33). Apparently three vehicles exist whereby an employee may receive a promotion: (1) an in-place promotion; (2) a promotion resulting from the Talent Review Process; and (3) an employee-initiated promotion by using the Salary Position Access Network (SPAN). (*Id.*). Ms. Bowman avers that the decision-making involving promotions is both subjective and objective. (*Id.* at para. 34). The Human Resources Guideline 6.3, Promotion sets forth objective criteria. (*Id.* and Exh. 19). Human Resources performs oversight functions in decisions regarding promotions. (*Id.*).

The age, gender, race, and national origin can be found on every employee on an Employee Change Notice (ECN). (Dkt. 68 at Vol. I at A1 at para. 35; Vol. II at A18 at para. 16). This information is used by Honeywell to comply with governmental requirements related to affirmative action. (*Id.* at A1 at paras. 35–37; Vol. II at A18 at para. 16). As a former compliance officer with the Office of Federal Contract Compliance (OFCCP), Mr. Neal[8] avers that "the OFCCP requires affirmative action employers to keep a record of the gender and minority status of employee candidates, and the ECN provided a vehicle to do that." (Dkt. 68 at Vol. II at A18 at para. 16).

Ronald Boyce, one of the named plaintiffs, ran the Find Engineering Experience (FEE) program. (Dkt. 68 at Vol. I at A1 at para. 54). The FEE program permits any current employee to receive a $1500 cash payment if he or she recommends an experienced engineer who is later hired. (*Id.*). This program has no application to hiring for other job positions; it is used only to locate experienced engineers. (*Id.*).

### Named Plaintiffs

The named plaintiffs work or worked[9] at either GNO or SASSO. Kathy Kelley, a white female, began working for SASSO in 1985. (Dkt. 67 at Exh. 8 at para. 2). She avers that she did not receive a promotion to Human Resources Consultant due to gender discrimination. (Dkt. 67 at Exh. 8 at paras. 4 and 9). Another white female, however, did receive one of the three consultant positions. (Dkt. 68 at Vol. II at A6 at para. 15). The decision makers for that promotion were composed of two white men and two women, one white and one Hispanic. (Id. at para. 16). She notes examples of "several forms of sexual harassment" she has suffered such as inappropriate e-mails and comments made by upper level employees. (Dkt. 67 at Exh. 8 at paras. 5–6, 10–13). Ms. Kelley runs the Diversity Council's meetings at Honeywell.[10] (Dkt. 68 at Vol. II at A5 at para. 18). It is disputed whether Ms. Kelley did not receive a promotion because of her job performance.

Lashon Anthony–Lofgren is an African–American female who works for GNO. (Dkt. 68 at Vol. V at D1 at page 8). She complains that she has not been promoted since she was rehired in July 1990 after a lay-off. (Dkt. 67 at Exh. 14 at para. 7). She has received salary increases, however. (Dkt. 68 at Vol. V at D1 at pages 24–25, 127). She claims to be tagged as a Software Engineer to satisfy the minority quota. (Dkt. 67 at Exh. 14 at para. 10; Dkt. 68 at Vol. V at D1 at page 131). She avers that all jobs are not SPAN'd so that employees from within the

---

8. Millard Neal, a 69–year old black male, was formerly employed by SASSO and has consulted for Honeywell as recently as 1996. (Dkt. 68 at Vol. II at A18 at para. 1).

9. Bertha Stephens no longer works for Honeywell.

10. A Diversity Council was form in 1994 by Eileen Flynn, a white female. She was hired by David Brumbaugh who was the Director of SASSO Human Resources in 1994. (Dkt. 68 at Vol. 1 at A1 at paras. 40–41). Larry Speight, who has been the Vice–President and General Manager of SASSO since July 1997, prompted David Brumbaugh to hire Ms. Flynn. (Dkt. 68 at vol. II at A21 at paras. 3 and 6). Kathy Kelley took responsibility for the Diversity Council about one year after its formation. (Dkt. 68 at Vol. 1 at A1 at para. 42).

company may apply for openings. (*Id.* at para. 16). It is disputed whether she has failed to receive a promotion due to her race or due to her performance.

She avers both minority and gender problems within GNO's Software Engineering Department. (Dkt. 67 at Exh. 14 at para. 14). Her specific complaint as to racial discrimination involves a post-it note left in her cubicle with a racist symbol drawn on it. (Id. at para. 12). The white male employee who left it in her cubicle explained its intended meaning, showed remorse, and received some type of reprimand and required training from Honeywell. (Dkt. 68 at Vol. II at A10 at paras. 12 and 13; Id. at A9 at paras. 24–36). Whether the supervisors appropriately responded to the incident is disputed.

Ronald Boyce is an African–American male who began his career thirteen years ago as a Principal Business Systems Analyst in the information systems and still continues as a grade level A5 with only a 3% salary increase in the past five years. (Dkt. 67 at Exh. 9 at para. 2). The grade level A5 has been redesigned to a level 15, and he is now assigned to SASSO Human Resources. (Dkt. 68 at Vol. V at D2 at page 11). When Mr. Boyce received a staffing position with Human Resources, a formal SPAN posting was not done. (Dkt. 67 at Vol. I at A1 at para. 58). He claims that he has not had a raise in six years. (Dkt. 68 at Vol. V at D2 at page 154). He claims that Honeywell has a "plantation mentality." (*Id.* at page 150). Whether Mr. Boyce should have been promoted or received raises based on his job performance is disputed. Mr. Boyce has no claims against GNO. (*Id.* at page 72).

Connie Hansen is a native American female who has worked for Honeywell for twenty-three years. (Dkt. 67 at Exh. 10 at para. 2). She claims she was removed from her position as a Contract Manager in 1995 at SASSO to an individual contributor position. (*Id.* at para. 3). She lists examples of gender and racial discrimination which she was aware of over the course of her employment. (*Id.* at para. 11). She claims that a

person who held a high position at Honeywell "asked me in a sneering way, 'Where's your Chief?' " At that time her boss was an American Indian. (*Id.*) Her only claims are against SASSO. (Dkt. 68 at Vol. V at D3 at page 45). Whether Ms. Hansen's placement in an individual contributor position at SASSO was discriminatory is disputed.

Doris Harris is an African–American female who has worked at GNO since 1981. (Dkt. 67 at Exh. 13 at para. 3). She is presently a software configuration management technician at GNO. (Dkt. 68 at Vol. V at D4 at page 8). She complains that she was discriminated against based on gender and race by not receiving promotions and commensurate pay raises. (Dkt. 67 at Exh. 13). She later avers in the same document that "white, non-degree female employees within [her] group are moving faster than [she is]." (Emphasis added.)[11] (Dkt. 67 at Exh. 13 at para. 13). She received some inappropriate comments (not racial or sexual in nature) in a letter placed in her personnel file, and the writer was thereafter transferred. (Dkt. 68 at Vol. V at D4 at pages 17–26). Whether Ms. Harris did not receive the promotions and salary increases she desired for reasons of performance is disputed.

Linda McLeod–Alexis is an African–American female engineer with a B.S. degree who began working for GNO in 1981. (Dkt. 67 at Exh. 15 at para. 3). She received many promotions and salary increases until 1989 when Honeywell started down-sizing. (Dkt. 67 at Exh. 15 at paras. 4–6). She worked at GNO as a quality engineer until she came to SASSO as a quality engineer. (Dkt. 68 at Vol. V at D6 at pages 9–10). She did not receive a promotion in 1997, which required a B.S. degree, yet a white female filled the opening. (*Id.* at para. 11). One of the managers at GNO contends that Ms. McLeod–Alexis did receive a promotion in 1997 along with a salary increase, for which he recommended her. (Dkt. 68 at Vol. II at A2 at para. 6). She had SPAN'd for the E03 opening at SASSO in 1997. (Dkt. 68 at Vol. II at A2 at para. 6). She also mentions incidents

---

**11.** The Court notes the inconsistency of this named plaintiff's position with respect to gender discrimination.

at Honeywell which she perceived as racially discriminatory. Whether her job performance warranted her slow path to promotion is disputed.

Bertha Stephens is an African–American female who worked for Honeywell for over thirteen years before she retired in 1998. (Dkt. 67 at Exh. 12 at para. 2). Just before she retired, she had begun working for SASSO as an assistant human resources coordinator. (Dkt. 68 at Vol. V at D7 at page 8). She had worked as a secretary for over thirteen years but complains that she was not promoted and did not receive raises as quickly as she deserved. (*Id.* at paras. 2–10). She refers to racial slurs she overheard while working at Honeywell. (*Id.* at paras. 14–15). She mentions that a white female received a bonus for filling in for another employee while a black female never received compensation for filling in for another employee. (*Id.* at para. 13). It is disputed that any discrimination occurred.

Gloria Watkins is an African–American female who has worked for Honeywell since 1973. (Dkt. 67 at Exh. 11 at para. 2). She is presently a cost analyst. (Dkt. 68 at Vol. V at D8 at page 6). She claims to have been blacklisted by SASSO in the mid 1980's. (Dkt. 68 at Vol. V at D8 at page 52). She claims she was denied promotional opportunities, and lists several racial slurs that she heard during her tenure at Honeywell. (Dkt. 67 at Exh. 11 at paras. 14–17). She is claiming race and gender discrimination as well as retaliation blacklisting. (Dkt. 68 at Vol. V at D8 at page 55). Honeywell denies that she was blacklisted.

## Analysis

■ Courts have been dissuaded from certifying "across-the-board" class actions in Title VII cases. *See General Telephone Co. v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982).[12] While there may be some circumstances which could conceivably justify certification in employment cases, there must be "[s]ignificant proof that an employer operated under a general policy of discrimination" which "manifested itself ... in the same general fashion" to all class members. *See Falcon,* 457 U.S. at 159 n. 15, 102 S.Ct. 2364. Such general policy may not be "abstract." *Id.* The decision making process must be "entirely subjective." *Id.* "The mere fact that an aggrieved private plaintiff is a member of an identifiable class of persons of the same race or national origin is insufficient to establish his standing to litigate on their behalf all possible claims of discrimination against a common employer." *Id.*[13]

## Rule 23(a) Prerequisites

Plaintiffs seek to certify a class pursuant to Federal Rule of Civil Procedure 23(b)(2) or 23(b)(3). (Dkt. 67 at pages 28–30). Before addressing the necessary elements of each of those subsections, the Court must first find whether Plaintiffs have met their burden of satisfying the four prerequisites under Rule 23(a): (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. "[A] Title VII class action, like any other class action, may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Falcon,* 457 U.S. at 161, 102 S.Ct. 2364.

■ In looking at the first prerequisite, it is clear from the numbers of female and minority employees at SASSO and GNO that Plaintiffs would have enough members to satisfy the numerosity requirement. Thus,

---

12. *See also Washington v. Brown & Williamson Tobacco Corp.,* 959 F.2d 1566, 1569 (11th Cir. 1992); *Griffin v. Dugger,* 823 F.2d 1476, 1480 (11th Cir.1987).

13. Neither party specifically mentions the term "standing" in the context of this class certification. This Court assumes that the parties are satisfied that the class representatives have met the procedural requirements of Title VII. *See Jones v. Firestone Tire and Rubber Co.,* 977 F.2d 527, 531–32 (11th Cir.1992); *Griffin v. Dugger,* 823 F.2d 1476, 1482 (11th Cir.1987), *cert. denied,* 486 U.S. 1005, 108 S.Ct. 1729, 100 L.Ed.2d 193 (1988).

this Court will proceed to the remaining three prerequisites: commonality, typicality and adequate representation.

### Commonality/Typicality

Plaintiffs assert that SASSO and GNO combined have a uniform, centralized personnel system. They also assert that the statistical showings substantiate a finding of commonality. They claim that the available pool of qualified women, minorities, and people of different national origin provide an adequate base to allow for selection of them in management positions. They argue that the reality of the situation presents a segregated workforce based on selection, job level and rate of pay.

On close examination of the claims asserted by the eight named plaintiffs, the Court finds that the claims cover a vast array of individual circumstances. For example, Gloria Watkins complains of being blacklisted, which will require proof of circumstances unique to her. For some of the plaintiffs, SPAN was used in either obtaining or being denied promotions; for others SPAN was not used. Evidence specific to the particular job will be necessary to show whether SPAN should or should not have been used. For example, in the case of the reorganization of a department, SPAN is not used.

The putative plaintiffs work in two distinct operations, GNO and SASSO, with different positions in each operation. The named plaintiffs have claims ranging from a loss of grade level to a loss of prestige to a general discriminatory complaint of being blacklisted to varying claims of hostile work environment. It is not apparent that an underlying common policy of discrimination runs through each plaintiff's claims.

Finally, the Court finds, for purposes of determining whether to certify a class, that the decision making process at Honeywell was not "entirely subjective." Although both GNO and SASSO may follow the Human Resource Guidelines, these guidelines provide objective criteria to guard against dis-

crimination. Different supervisors made decisions using different procedures called for by the particular position. These decisions were based on the differing criteria for each of the positions. The members of the purported class were not subjected to the same decision making authority. Overall, this case does not appear to implicate a common, general policy concerning promotions and pay increases which has a discriminatory impact on the class.[14]

### Statistics

Dr. Peterson prepared a report for Plaintiffs titled "Report on the Status of Women and Minorities at the SASSO and GNO Units of Honeywell, Inc. 1996–1998." The results of his investigation from files provided by Honeywell show that women and minorities are concentrated in lower paying jobs than men and non-minorities, respectively, and that women and minority employees are paid less, on average, than men and non-minorities, respectively, with the greatest discrepancies being among professional employees. (Dkt.67, Exh. 6). After segregating nine Equal Employment Opportunity (EEO) categories ranging from officials and managers as the first category to service workers as the ninth category, Dr. Peterson summarized all of the categories to establish a substantial pay disparity between men and women. He wrote that the disparity "is far too great a difference to attribute solely to chance, and it indicates strongly that either employee gender or some factor or factors correlated with employee gender helped determine employee pay."

The Court agrees with Honeywell that while the statistics show the female and minority representation within broad job categories, these statistics do not necessarily establish discrimination in promotion.

### Adequate Representation

The Court finds it highly likely that the class representatives hold interests antagonistic to absent class members. Some of the

---

**14.** The fact that ECNs contain information about gender, race and national origin does not ipso facto evidence a general policy of discrimination in deciding to promote. The EEOC and the OFCCP require Honeywell to provide such information to them to account for equal employment opportunities and affirmative action.

class representatives have female or Hispanic female supervisors who are accused of discriminating against those very class representatives. Those same supervisors and other employees who are female or minority, which would make up the absent class members, hold jobs the class representatives were denied. In the situations in which a minority, female or person of a different national origin have obtained several promotions and hold positions higher than the named plaintiffs,[15] those absent class members could not be adequately represented in view of their conflicting interests.

### Temporal Span

Should the reasons already set forth be deemed unpersuasive, there is no question that the time period sought makes certification unwieldy. Plaintiffs seek a period from July 2, 1965, which is the effective date of Title VII, to the present. (Dkt. 67 at page 6). The Court finds this time frame prohibitive. The differences in the decision-making processes of SASSO and GNO as they have evolved through the years are unimaginable. With the claims of hostile work environment, disparate treatment and disparate impact, it is inconceivable based on the allegations and submissions provided to this Court how a class with a defined period spanning thirty-five years could be superlative to trying these claims individually. In any event, any other precise time period is not readily apparent from the file, and this Court will not attempt to suggest one.

15. The record confirms this fact.

16. To meet the criteria for certification under Rule 23(b)(2), Plaintiffs must show that Honeywell has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

17. To certify a class under Rule 23(b)(3), (1) the questions of law or fact common to the members

### Rules 23(b)(2) and 23(b)(3)

Having found that the plaintiffs did not meet the four prerequisites of Rule 23(a), this analysis need go no further. Neither Rule 23(b)(2)[16] nor Rule 23(b)(3)[17] can be satisfied without complying with subsection (a). Were this Court to reach that analysis, it seems clear that the addition of the compensatory and punitive claims in the amount of $100 million, would be found to predominate over the injunctive and declaratory relief sought. In any event, the commonality requirement of Rule 23(b)(3) is far more stringent than that of Rule 23(a),[18] and this Court has found that commonality under 23(a) does not exist.

It is therefore **ORDERED AND ADJUDGED** that Plaintiffs' Motion for Class Certification (Dkt. 48) and Plaintiffs' Amended Motion for Class Certification (Dkt. 88) are **DENIED.** The parties shall submit a revised Case Management Report no later than March 8, 2000. This case is rescheduled for preliminary pre-trial conference before the Honorable Mark A. Pizzo on Monday March 13, 2000, at 10:30 a.m. at Sam M. Gibbons United States Courthouse, Courtroom 11B, 801 N. Florida Avenue, Tampa, Florida.

of the class must predominate over any questions affecting only individual members and (2) a class action must be superior to other available methods for the fair and efficient adjudication of the controversy.

18. *See Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 117 S.Ct. 2231, 2243, 138 L.Ed.2d 689 (1997).